FILED

2017 Jan-12  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| OSCAR MARQUEZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 5:13-cv-01395-JHE |
| | ) | |
| EL PORTAL, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiffs Oscar Marquez, Eladio Gaspar Domingo, Veronica Segoviano, Erika Brito, and Jose Castillo bring this action against their employers, El Portal, Inc., El Portales, Inc., and Alvaro Salazar, for violations of the Fair Labor Standards Act ("FLSA"), and for breach of contract and fraud under Alabama law.  (Doc. 14).[1]  Defendants counterclaimed against Marquez.  (Doc. 6 at 14-19).  Defendants have moved for summary judgment on all of Plaintiffs' claims, (docs. 49 & 50), and Plaintiffs have moved for partial summary judgment on their FLSA claim, (docs. 51 & 51-45).  Defendants have also moved to strike an expert report from Plaintiff's motion and an affidavit attached to Plaintiffs' reply.  (Docs. 61 & 64).  The motions are briefed and ripe for review.  (Docs. 50, 51-45, 57, 59, 60, 61, 63, 64, 66-1, 67, 68, & 69).  The parties have not consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the undersigned recommends Defendants' motion for summary judgment be **GRANTED**

---

[1] The amended complaint originally included Plaintiff Maria Domingo, (doc. 14); however, she voluntarily dismissed her claims against Defendants with prejudice pursuant to Rule 41(a)(1)(A)(ii), FED. R. CIV. P., (docs. 55 & 56).  Mr. Gaspar Domingo's first name has been variously spelled "Eladrio" and "Eladio," but he testified the correct spelling is "Eladio." (Doc. 49-5 at 4 (9)).

**IN PART** and **DENIED IN PART**, and Plaintiffs' motion for summary judgment be **DENIED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat

a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Evidentiary Objections[2]

As a threshold matter, the Court must address Defendants' motions to strike evidence attached to Plaintiffs' briefs.  With the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, motions to strike submitted on summary judgment are no longer appropriate.  Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.  There is no need to make a separate motion to strike.  If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments).  "Before this amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike.  The plain meaning of these provisions show that objecting to the

---

[2] All citations to the record refer to document and page numbers as assigned by the Court's electronic filing system, except for citations to depositions and documents with numbered paragraphs, which also include a parenthetical with the specifically cited deposition page number(s) or numbered paragraph(s).

admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily." *Campbell v. Shinseki*, 546 Fed. App'x 874, 879 (11th Cir. 2013).

With regard to documents submitted as evidence, the 2010 rule change has, as it has with motions to strike on summary judgment, modified the applicable procedure. Under the former Rule 56, subsection (e) required documents supporting a motion for summary judgment be authenticated: "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." FED. R. CIV. P. 56(e)(1) (2009 version). Revised Rule 56 eliminated the bright-line requirement that documents be authenticated and

> allows a party making or opposing a summary judgment motion to cite to materials in the record including, among other things, "depositions, documents, electronically stored information, affidavits or declarations" and the like. FED. R. CIV.P. 56(c)(1)(A). If the opposing party believes that such materials "cannot be presented in a form that would be admissible in evidence," that party must file an objection. FED. R. CIV.P. 56(c)(2). Significantly, the objection contemplated by the amended Rule is not that the material "has not" been submitted in admissible form, but that it "cannot" be.

*Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125, 1134 (N.D. Ala. 2014) (quoting *Foreword Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *2 (W.D. Mich. 2011)). In effect, "[u]nder the 2010 amendment, which became effective on December 1, 2010, authentication of documents no longer is required at the summary judgment stage." *Agee v. Chugach World Servs. Inc.*, No. 5:12-CV-2119-MHH, 2014 WL 5795555, at *5 (N.D. Ala. Sept. 30, 2014). Once the opposing party objects "that the materials . . . *cannot* be presented in a form that would be admissible in evidence," FED. R. CIV. P. 56(c)(2) (emphasis added), "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010

Amendments).

Accordingly, the undersigned construes the parties' motions to strike as objections to "the material cited to support or dispute" the other's facts on summary judgment. Because admissibility of evidence at the summary judgment stage does not affect admissibility at trial, the parties' arguments will only be considered to the extent they address material cited for summary judgment purposes, and material successfully challenged will not be considered in the facts and analysis below.

### A. Objections to Marquez Affidavit

Defendants' primary argument against the Marquez Affidavit is that it is "new evidence" attached to a reply and should not be considered because it was submitted in violation of the Scheduling Order and Defendants "have not been afforded [an] opportunity to respond to this new evidence." (Doc. 64 at 2-3). They also briefly contend it is "nothing more than a failed attempt to authenticate the records their client, Oscar Marquez admitted to stealing during his deposition" and the Court considering "such improper evidence" would deprive them of "a full and fair opportunity to be heard." (*Id.* at 3).

While the Marquez affidavit *is* an attempt to authenticate the records, it is for that very reason that it is not "new evidence," the consideration of which would deprive Defendants of a fair hearing. In their reply brief in support of their motion for summary judgment and in their motion to strike the Plaintiffs' expert report, Defendants contend the evidence upon which the expert report is based is inadmissible as hearsay. (Doc. 60 at 4; doc. 61 at 3-5). Because Defendants have raised the issue of inadmissibility under Rule 56(c)(2), "[t]he burden is on [Plaintiff] to show that the material is admissible as presented or to explain the admissible form that is anticipated."

FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments).  Defendants cannot deprive them of that opportunity by applying the "new evidence" label to the affidavit attempting to establish the documents' admissibility.  The documents attached to the affidavit are identical to those already in the record.  (*Compare* doc. 57-9 at 1-12 & 57-10 at 1-3, *with* doc. 63-3 at 6-18).  Whether the affidavit is sufficient to establish the admissibility of the documents is one of the primary arguments in the objection to the expert report and will be considered below, but the objection to consideration of the Marquez affidavit is **OVERRULED**.

### B. Objections to Plaintiffs' Expert Report

Admissibility of expert testimony requires a determination whether "(1) the expert is 'qualified to testify competently regarding the matters he [or she] intends to address'; (2) the expert's methodology is 'sufficiently reliable'; and (3) the expert testimony 'assists the trier of fact.'"  *Moulton v. DeSue*, No. 3:11-CV-382-J-37JBT, 2012 WL 8963571, at *1 (M.D. Fla. Nov. 1, 2012) (quoting *City of Tuscaloosa v. Hacros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  Regarding Plaintiffs' Expert Report, (doc. 57-8), Defendants make two main arguments: it is due to be stricken because it is unsworn, (doc. 61 at 2-3), and subparts 1-6, 9,[3] and 12-14 (the underlying documents and expert calculations based thereon) are unauthenticated and inadmissible hearsay, (*id.* at 3-5).  The former is a general evidentiary objection and the latter essentially argues the evidence will not assist the trier of fact because an expert's opinion regarding inadmissible

---

[3] There does not appear to be an Exhibit 9 attached to the expert report, (*see* doc. 57-13 at 12; doc. 57-14 at 1-12; doc. 57-15 at 1-12; doc. 57-16 at 1-9); however, Exhibit 9 also appears to be a spreadsheet of the expert's own analysis, an excerpt from which appears in the report, (*see* doc. 57-7 at 7 n.12 & 8), and which the expert could, and did, verify and affirm by affidavit, (doc. 66-2 at 1 (¶¶ 3-4)).

evidence is irrelevant.[4]

Plaintiffs respond to the first argument by stating the expert report is a final report and "verified and reaffirmed" by declaration attached to the response.  (Doc. 66-1 at 2-4).  To the second argument, Plaintiffs contend Marquez authenticated the documents at his deposition and in his affidavit attached to the reply because he was the custodian of these records.  (Doc. 66-1 at 4-5).  Defendants' reply counters that (1) the expert's affidavit does not consider the questionable authenticity of the evidence he based his conclusions on, does not state he is competent to testify to the matters therein, and, regardless, does not cure any deficiencies in the subparts, and (2) Plaintiffs do not show how the records are admissible or what admissible form they could have at trial.  (Doc. 68 at 1-3).

### 1. Objections to Lack of Foundation for Report

First, the objection to the expert report as unsworn is not well taken.  Assuming Defendants' objection qualified as a showing the evidence "cannot be presented in a form that would be admissible in evidence," the courts have repeatedly held an expert may cure any defect in an unsworn report by subsequent affidavit or declaration.  *See Hudson v. Pennsylvania Life Ins. Co.*, No. CV-12-S-2225-NE, 2013 WL 3242877, at *10 (N.D. Ala. June 21, 2013); *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1039 (N.D. Cal. 2011) (citing *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006)); *Cf. Southland Health Servs., Inc. v. Bank of Vernon*, 887 F. Supp. 2d 1158, 1171-72 (N.D. Ala. 2012) (holding that unsworn preliminary expert reports could not be considered where expert's

---

[4] Because Defendants do not challenge the expert's qualifications or his methodology, the undersigned does not address these prongs of the analysis.  *See Moulton*, No. 3:11-CV-382-J-37JBT, 2012 WL 8963571, at *2 n.1.

7

testimony undermined the report's conclusions and the expert never provided a supporting affidavit).  These holdings are certainly in line with the 2010 Amendments to Rule 56.

Defendants seem to acknowledge as much, shifting the arguments in their reply to the equally unpersuasive argument the expert's affidavit failed "to state whether he reaffirms his opinion and verifies such opinion in light of the nature of Subparts 1 and 2 and the fact that these documents' authenticity is disputed."  (Doc. 68 at 1-2).  Considering the fact the expert has not opined—and has not been asked to opine—on the question of the underlying documents' authenticity, it is unclear why such an affirmation is necessary.  The expert's report clearly assumes the authenticity of the underlying documents, (*see* doc. 66-3), and, although the viability of his conclusions may depend on the authenticity and admissibility of those documents, the admissibility of his report does not depend on his *opinion* of the authenticity of those documents.

Defendants also contend the affidavit "fails to state it is made on personal knowledge and that [the expert] 'is competent to testify to the matters related therein.'"  (Doc. 68 at 2) (quoting *Southland*, 887 F. Supp. 2d at 1169).  However, the affidavit explicitly states the expert has "personal knowledge of the fact in this *Affidavit*" and that the attached copy of his report "accurately reflects [his] qualifications, professional opinions and documents relied upon in forming such opinions."  (Doc. 66-2 at ¶¶ 1 & 3).  There does not appear to be any defect in the report's authenticity or admissibility.

### 2. Objection to Foundation and Admissibility of the Underlying Documents

Second, Defendants contend certain subparts (documents upon which the report is based) have not been authenticated and are inadmissible hearsay.  Further, they argue all but one of the challenged subparts do not fall into the business records exception because they are not

accompanied by a document stating they were received and preserved in the regular course of business.  Then, they further contend Marquez stole two of the subparts, breaking the chain of custody.

As for the authentication argument, Defendants do not cite a single case addressing the 2010 Amendments to Rule 56.  The case they do cite was released before the 2010 Amendments were even enacted and almost a full year before they became effective.  (Doc. 61 at 4-5) (citing *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010) (issued January 11, 2010).  *See also* FED. R. CIV. P. 56 (enacted, in its current form, April 28, 2010, and effective December 1, 2010).  "However, '[t]he *Saunders* opinion [Defendants cite] does not govern this issue because Rule 56 was amended in 2010.  Under the 2010 amendment, which became effective on December 1, 2010, authentication of documents no longer is required at the summary judgment stage.'"  *Sanders v. Benjamin Moore & Co.*, No. 4:11-CV-0397-JEO, 2015 WL 1489855, at *38 (N.D. Ala. Mar. 31, 2015) (quoting *Agee v. Chugach World Services, Inc.,* 5:12-cv-2119-MHH, 2014 WL 5795555, *5 (N.D. Ala. Sept. 30, 2014) (citing *Abbott v. Elwood Staffing Servs., Inc.,* 1:12-cv-2244-VEH, 2014 WL 3809808 (N.D. Ala. July 31, 2014) ("The majority of the opinions this Court has read from courts construing current Rule 56, however, state the amendments eliminated the authentication requirement and replaced it with a requirement that evidence be presentable in admissible form at trial .")))

Only the second argument implies the necessary objection under Rule 56(c)(2) (*i.e.*, "that the material cited . . . cannot be presented in a form that would be admissible in evidence"), arguing the evidence is inadmissible hearsay because, Marquez having broken the chain of custody of the documents, they do not fall into the business-records exception.  (Doc. 68 at 3).  Having

done so, "[t]he burden is on [Plaintiffs] to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments).

Plaintiffs contend Marquez could and did establish the documents as business records because he was the custodian of the records. (Doc. 66-1 at 4-5). Specifically, they contend Defendants' assertion the documents were stolen is a "red herring" because "so long as the documents can be properly authenticated, they should be considered at summary judgment" and Marquez was the one responsible for maintaining and compiling the documents that were submitted to the accountant. (Id. at 4-5). Defendants' counterargument focuses on the elements of the hearsay exception, asserting the documents "were not preserved in the regular course of business" because Marquez "broke the chain of custody." (Doc. 68 at 3). Defendants do not cite any cases to support this particular interpretation of the evidentiary rule.

The hearsay exception for records of regularly conducted activities allows a record to be used for the truth of its contents if

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). Defendants do not dispute the alleged records meet requirements A,

C, D, and E, but contend only that "no affiant or declarant states that these document were received *and* preserved in the regular course of business."  (Doc. 68 at 3).

However, Marquez's affidavit establishes he was the General Manager for Defendants and part of his responsibilities was maintenance of the companies' records.  (Doc. 63-3 at 2).  His deposition further establishes his knowledge of the companies' recordkeeping procedures, part of which seems to include records staying in his vehicle or home office for long periods of time. (Doc. 49-7 at 38-41 (142-155)).  Salazar similarly stated that, as General Manager, Marquez "was responsible for maintaining financial records and delivering those records to [the] accountant." (Doc. 49-1 at 3 (¶ 11)).  The documents at issue were made and originally preserved in the regular course of Defendants' business and only ceased being kept and preserved under what appears to be their common (if not official) practice when Marquez was fired and was no longer officially authorized to retain them.

This chain of custody issue, however, merely goes to the weight of the evidence before the jury and does not deprive them of their character as business records.  *See Solutia, Inc. v. McWane, Inc.*, No. 1:03-CV-1345-PWG, 2012 WL 2031350, at *13 (N.D. Ala. June 1, 2012) ("[G]aps in the chain of custody normally go to the weight of the evidence rather than its admissibility.") (quoting *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 311 n.1 (2009)).  *See also Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 540250, at *10 (N.D. Ill. Feb. 11, 2014) ("Any chain of custody problems, such as questions about the handling of the hard drive after it left Joel Abraham's possession, would not defeat authentication under the business records exception. A chain of custody is a 'common requirement in authenticating evidence . . . [but] an uninterrupted chain of custody is not a prerequisite to admissibility. Instead, gaps in the chain go to the weight

of the evidence, not its admissibility.'") (quoting *Cooper v. Eagle River Mem. Hosp., Inc.*, 270 F.3d 456, 463 (7th Cir. 2001)) (modifications in original).

As a result, the documents, despite any dispute about their authenticity,[5] have been established as business records, and Defendants' objection to their admissibility is not well taken. Therefore, because both of Defendants' arguments against the expert report fail and they do not otherwise dispute its admissibility as an expert opinion, their objection to its consideration on summary judgment is **OVERRULED**.

### III. Summary Judgment Facts

#### A. The Restaurants

Defendant Alvaro Salazar is a Mexican citizen, who immigrated to the United States in the 1980s and now holds a U.S. permanent resident card.  (Doc. 49-9 at 4-5 (9-10 & 13)).  Since immigrating to the U.S. Salazar has held many jobs, including several in Mexican restaurants.  (*Id.* at 7-8 (19-26)).  After a while, he began to open his own restaurants.  (*Id.* at 9 (27-28) & 15-16 (53-54)).  In 2001, he opened his first, solely owned Mexican restaurant, named El Portal, which he operated through El Portal, Inc.  (*Id.* at 6 (17) & 12 (38 & 40-41)).  In 2005, he opened a second restaurant, also called El Portal, and operated it through a second corporation he formed, named El Portales, Inc.  (*Id.* at 13 (42-43), 18 (65), & 29; doc. 57-2 at 3 (¶ 4) (not disputing the name of the restaurant, only the official name of the corporation).  This second corporation is sometimes referred to as Los Portales, Inc. in the record, which appears to have been the originally intended

---

[5] Defendants also assert Marquez "possibly forged evidence" but do not cite any evidence to support this contention.  (Doc. 69 at 2).

name, but for a mistake by the accountant who set it up on Defendant Alvaro Salazar's behalf.  (*Id.* at 13 (43-45); doc. 51-33 at 2-3).[6]

The first restaurant has a bank account at Regions Bank, and the second restaurant has a separate account at Bank Independent.  (Doc. 49-9 at 14 (46)).  Checks from the Bank Independent account were sometimes labeled "El Portal" and sometimes "Los Portales" but always had the same address for the second restaurant.  (Doc. 49-9 at 15 (51) (noting the second El Portal restaurant's checks from the Bank Independent account were labeled "1315 Highway 31 Northwest, Hartselle, Alabama 35640"); doc. 57-8 at 9 (noting all the checks had the same address (1315 Highway 31 NW, Hartselle, AL 35640)); doc. 57-17 at 4-9 (showing some checks labeled "El Portal" and some "Los Portales"); doc. 57-18 at 5-8 (same)).  Only this one bank account at Bank Independent was used to write payroll checks during the time all of the plaintiffs worked for Defendants from 2010 through 2014.  (Doc. 49-9 at 22 (79-80)).

The entities' combined gross receipts reported for income tax in 2010, 2011, 2012, and 2013 exceeded $500,000 each year.  (Docs. 51-36 & 51-37).  Assuming all reasonable inferences in Plaintiffs' favor for purposes of Defendants' motion, the monthly cash revenue and annual gross revenue of El Portal and Los Portales are materially under-reported, and Los Portales exceeded $500,000 in gross receipts for every year between 2010 and 2013.  (Doc. 57-8 at 4-8).  Assuming all reasonable inferences in Defendants' favor for purposes of Plaintiffs' motion, the federal tax returns provided by Los Portales are accurate, and its gross receipts did not exceed $500,000 any year between 2010 and 2013.  (Doc. 49-1 at 6, 13, 21, & 29).

---

[6] To distinguish the two restaurants and their operating companies, this Report and Recommendation will refer to "El Portal, Inc." and the restaurant operated by it as "El Portal," and "El Portales, Inc." and the restaurant operated by it as "Los Portales."

**B. Oscar Marquez**

In late 2005, Salazar met and hired Marquez, who was working in Tennessee as a manager of another Mexican restaurant, to be general manager of both El Portal locations, beginning January 1, 2006.  (Doc. 49-7 at 8 (22), 11 (35-37), & 12 (39-40); doc. 49-9 at 18 (65)).  He remained in that position until June 30, 2013.  (Doc. 49-7 at 39 (148); doc. 57-2 at 4 (not disputing these facts)).  As general manager, Marquez had keys to the restaurant's office; set work schedules and menu prices; and, along with Salazar, could hire and fire employees, although Marquez testified Salazar "always had the last word."  (Doc. 49-7 at 12 (41-43), 22 (78), & 31 (115); doc. 49-9 at 18 (64-65)).  Marquez signed payroll checks and checks to vendors, as a signatory on the first restaurant's bank account and with permission to sign Salazar's name on checks from the second restaurant when Salazar was not there.  (Doc. 49-7 at 13 (43-44) & 48 (183)).  He was also responsible for filling out new employee paperwork, although he testified Salazar sometimes told him to wait on filling out paperwork for a week to see if the employee worked out.  (*Id.* at 13 (44-45), 18 (64-65), & 20 (70-71)).  He ran the day-to-day operations (according to Marquez, based on Salazar's detailed instructions and only with his permission on any particular decision), and people in town thought Marquez owned the restaurants.  (*Id.* at 21-22 (75 & 77-78) & 23-24 (85-86)).  He was paid $1,400 twice a month in salary for the majority of his tenure, but, for his last six months with the restaurants, he was paid that amount only once a month.  (*Id.* at 34 (127-29); doc. 60 at 1 (not disputing this fact)).

Salazar travelled to Mexico at least eight times a year on trips usually lasting a week to ten days but up to three weeks or a month.  (Doc. 49-9 at 23 (84-85)).  Salazar testified he was not at

the restaurant often even when he was in town, (*id.* at 24 (86-87)), but Marquez testified he was there every day, (doc. 49-7 at 21 (76)).

Salazar used Laura Walker of Walker & Associates to handle the payroll and taxes for both of his restaurants.  (Doc. 49-9 at 20 (72)).  Marquez was responsible for completing and delivering the bi-weekly payroll timesheets to Walker & Associates, from which Walker prepared payroll checks and calculated withholdings for employees.  (Doc. 49-1 at 3 (¶ 11); doc. 49-2 at 3 (¶¶ 9, 12, & 14-16); doc. 49-7 at 13 (45)).  She returned all of the original documents to Marquez when payroll and tax preparation was complete.  (Doc. 49-2 at 3 (¶¶ 12 & 17)).

Marquez testified that, during his last two years at the restaurants, he felt he had been pushed out by, and lost the authority to hire and fire to, Salazar's son, daughter, and son-in-law.  (Doc. 49-7 at 18 (62-64)).  In 2013, Marquez had an affair with Salazar's daughter-in-law.  (*Id.* at 24-25 (87-93)).  When the affair was discovered, Salazar fired Marquez in June 2013.  (Doc. 49-1 at 3 (¶ 10)).

### C. The Other Plaintiffs

The other plaintiffs, Eladio Gaspar Domingo, Veronica Segoviano, Erika Brito, and Jose Castillo all worked at the second El Portal restaurant around the same time period.  (Doc. 57-2 at 6 (not disputing this fact in ¶ 19)).[7]

---

[7] In their opposition to Plaintiffs' motion for partial summary judgment, Defendants dispute that Castillo, Segoviano, and Brito worked at the restaurant on the grounds none produced valid identification and each took the Fifth Amendment when asked about their proof of identification.  (Doc. 59 at 5-6, 8).  To the extent Defendants suggest this calls into question whether those plaintiffs worked at the Los Portales restaurant, Defendants never develop this beyond implication.

Erika Brito moved to the United States from Mexico over ten years ago, and Marquez hired her as a server at the restaurant in December 2011, where she worked until December 2012. (Doc. 49-3 at 4-5 (9-10) & 7 (19)). Marquez gave her her work schedule the entire time she worked there. (*Id.* at 11 (35); doc. 57-2 at 7 (not disputing this fact in ¶ 21)). Brito testified Marquez did not have her fill out paperwork when she first started working, but, later, Salazar made her fill out an application and other employment and payroll documentation. (Doc. 49-3 at 7 (19-20) & 9 (26); doc. 57-2 at 7 (not disputing these facts in ¶ 22)). She was to report problems at work to Marquez and never reported a pay problem to Salazar. (Doc. 49-3 at 9 (29); doc. 57-2 at 7 (not disputing these facts in ¶ 23)).

Jose Castillo is also from Mexico. (Doc. 49-4 at 4 (8)). He testified he worked at the second restaurant as a server from October 2012 until June 2013, where he was paid only in tips. (*Id.* at 13-14 (45 & 48)). He testified he usually worked a total of fifty-eight hours a week. (*Id.* at 14-15 (49-52)). He was ultimately fired for failing to show up for work one day. (*Id.* at 15 (53)). While working there, he never reported a problem with his pay to Salazar. (*Id.* at 15 (52)).

Eladio Gaspar Domingo is originally from Guatemala. (Doc. 49-5 at 5 (11)). Marquez hired him to work at the restaurant, and he lived with Marquez while he worked there. (*Id.* at 8 (22)). He joined the lawsuit because he lived with Marquez and Marquez asked him to. (*Id.* at 13 (45)). Because they lived near the restaurant, Domingo was allowed to go home during his break. (*Id.* at 20 (70)). Domingo met Salazar after he had worked at the restaurant for a week and did not realize he was the owner. (*Id.* at 20 (71-72)). He thought Marquez and Salazar were business partners. (*Id.* at 24 (87-88)). Domingo testified Marquez told him he would only be paid in tips, (*id.* at 24 (88-89)), but Marquez testified that not putting people on payroll was a practice

mandated by Salazar, (doc. 49-7 at 20 (71) & 22 (79-81)).  Marquez testified Salazar told him not to put everybody on payroll (especially people without cars who were less likely to encounter the police) because the restaurants' taxes would go up.  (*Id.* at 20 (70-71) & 22-23 (80-84)).  Domingo admitted he signed the bi-weekly payroll sheets given to the accountant.  (Doc. 49-5 at 22 (78-81)).

Veronica Segoviano was born in Mexico and came to the United States over ten years ago. (Doc. 49-6 at 5 (10 & 12)).  She worked at a Mexican restaurant named El Camino Real, where she was only paid cash or tips and never placed on the payroll.  (*Id.* at 9-10 (27-28 & 30) & 11 (35-37); doc. 57-2 at 7 (not disputing these facts in ¶ 39).  She began working at the second El Portal restaurant the last week of January 2012, after Brito suggested she apply.  (Doc. 49-6 at 12 (41) & 19 (69)).  She was allowed to leave the restaurant during her two hour break but usually stayed because she did not have a car.  (*Id.* at 14 (48)).  She testified she usually worked fifty-five hours per week, (doc. 49-6 at 14 (47-48)), but she never reported a problem with her pay to Salazar, (*id.* at 15 (53)).  She met Marquez on her second day at work.  (*Id.* at 13-14 (45-46)).  She testified that, during her employment, Marquez assisted her family with the purchase of a car by getting the loan and car in his name and having them pay him.  (*Id.* at 21-22 (77-78)).  She quit her job the same day as Brito, on December 23, 2012.  (*Id.* at 19 (69); doc. 49-3 at 17 (61)).

Castillo, Segoviano, and Brito all worked in excess of forty hours per week and received only tips as compensation instead of a cash wage.  (Doc. 49-4 at 13 (45) & 14-15 (49-52); doc. 49-6 at 14 (47-48) & 15 (53); doc. 49-3 at 8 (25) & 21 (74-77); doc. 60 at 3 (not disputing this fact)).

## IV. Analysis

17

Plaintiffs allege Defendants denied Segoviano, Brito, Castillo, and Domingo overtime pay and pay sufficient to meet the federal minimum wage in violation of the Fair Labor Standards Act. (Doc. 14 at ¶¶ 45-54). Additionally, Plaintiffs allege Defendants breached their contract with Marquez by denying him two weeks paid vacation. (*Id.* at ¶¶ 57-59). Finally, Marquez and Domingo allege Defendants defrauded them through unfulfilled promises intended to induce them into continuing to work for Defendants. (*Id.* at ¶¶ 60-64). Both parties have moved for summary judgment on the FLSA claim (although only Segoviano, Brito, and Castillo seek summary judgment in Plaintiff's motion), and the undersigned will address both motions in the context of each of that claim's elements. Defendants have also moved for summary judgment on the breach of contract and fraud claims.

**A. FLSA Claim**

"To prove a violation of the minimum and overtime wage provisions of the FLSA, Plaintiffs must show: (1) that each was employed by Defendants during the time of the alleged violations; (2) enterprise or individual coverage under the FLSA; and (3) violations of the minimum and overtime wage requirements." *Leblanc v. USG7, LLC*, No. 6:12-CV-1235-ORL-41, 2015 WL 4635156, at *2 (M.D. Fla. Aug. 3, 2015) (citing 29 U.S.C. §§ 206(a) & 207(a)). Defendants' motion for summary judgment disputes all of these elements to one degree or another, contending Plaintiffs have not established individual coverage under the FLSA and could not establish enterprise coverage on the facts of this case; that El Portal, Inc. and Salazar were not Plaintiffs' employers; that Marquez was exempt or otherwise not entitled to overtime. (Doc. 50). They also allege the *in pari delicto* defense against all of the plaintiffs. (*Id.*). Plaintiffs' motion

for summary judgment contends Plaintiffs Castillo, Segoviano, and Ramirez have met all of the necessary elements as a matter of law.  (Doc. 51-45).

### 1. Enterprise Coverage[8]

 "A claim for enterprise coverage requires a plaintiff to establish two elements: (1) that the employer or group of employers are an enterprise [as defined in 29 U.S.C. § 203(r)(1)], and (2) that the employer-enterprise meets the requirements of 29 U.S.C. § 203(s)(1)."  *Leblanc*, No. 6:12-CV-1235-ORL-41, 2015 WL 4635156, at *2.  Defendants' motion argues the two restaurants are not a single enterprise and, therefore, Los Portales does not meet the minimum sales requirement for FLSA coverage.  (Doc. 50 at 15-18).  Plaintiffs' motion contends both that the two restaurants are a single enterprise with sales over the minimum requirements and that, because Los Portales underreports its sales, it meets the minimum requirement by itself.  (Doc. 51-45 at 12-15).

### a. "Enterprise"

"'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose," *Leblanc,* No. 6:12-CV-1235-ORL-41, 2015 WL 4635156 at *2 (quoting 29 U.S.C. § 203(r)(1)), which "requires the existence of [all] three [of the following] elements: (1) related activities; (2) unified operation or common control; and (3) a common business purpose," *id.* (quoting *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir. 1984)).

---

[8] Defendants' motion for summary judgment also argued Plaintiffs are not engaged in interstate commerce and, therefore, do not have individual coverage under the FLSA.  (Doc. 50 at 12-14).  Plaintiffs explicitly abandon this argument for purposes of summary judgment.  (Doc. 51-45 at 15; doc. 57-2 at 14 n.1).

The first two are easily met on the facts of this case. "Related activities" need only be "the same or similar" activities, *id.* (quoting *Donovan*, 723 F.2d at 1551)), which is clearly met here because the two restaurants both perform the same activities, *i.e.*, running a Mexican-themed restaurant. (Doc. 49-9 at 6 (17), 12-13 (38, 40-43), 15 (50-51, 53)) "'Common' control . . . exists where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together." 29 C.F.R. § 779.221. Both El Portal restaurants and their underlying corporations are owned and operated by the same person, Alvaro Salazar. (Doc. 49-9 at 12-13 (38, 40-43)). Moreover, both restaurants had the same general manager, Oscar Marquez. (Doc. 49-7 at 12 (40))

"Although the FLSA has not clearly defined 'common business purpose,' the Eleventh Circuit has held that '[m]ore than a common goal to make a profit . . . must be shown to satisfy the requirement.' However, evidence that the businesses are pursuing a common business plan and intermingling funds is sufficient to show a common business purpose." *Leblanc*, No. 6:12-CV-1235-ORL-41, 2015 WL 4635156, at *4 (M.D. Fla. Aug. 3, 2015) (quoting *Donovan*, 723 F.2d at 1553) (internal citations omitted). Courts have often declined to find a common business purpose absent intermingled profits. *See Cabral v. Lakes Cafe Sports Bar & Grill, Inc.*, No. 09-21128CIV-MCALILEY, 2010 WL 1372457, at *5 (S.D. Fla. Mar. 31, 2010) (holding that, because the restaurants did not own each other and there was no commingling of funds or profits, there was no common business purpose) (citing *Easton Land & Dev., Inc.*, 723 F.2d 1549, 1553 (11th Cir. 1984) (where entities did not intermingle profits, no common business purpose); *Tafalla v. All Florida Dialysis Serv., Inc.*, No. 07-80396, 2009 WL 151159, *11 (S.D. Fla. Jan. 21, 2009) (where one company made a profit from a second company, but there was no evidence of intermingling of

profits, the two companies did not have a common business purpose); *Jimenez v. Southern Parking, Inc.*, No. 07-23156-CIV, 2008 WL 4279618, at *12 (S.D. Fla. Sept. 16, 2008) (no common business purpose where entities did not receive revenues or funding from each other)).

Plaintiffs contend El Portal and Los Portales commingled their funds and expenses and "ran their business as one entity," satisfying the common business purpose requirement. Defendants contend the restaurants are incorporated separately and have separate bank accounts and, other than Marquez, Plaintiffs only claim to have worked at the second restaurant location run under El Portales, Inc. (Doc. 50 at 17).

It is not entirely clear what Plaintiffs' contention that the restaurants were run "as one entity" means because it is not otherwise supported by evidence. The only evidence cited in their argument is in support of the alleged commingling of funds. (*See* doc. 51-45 at 13; doc. 57-2 at 17). That assertion is, in turn, primarily, if not exclusively, based on a single piece of evidence, the statements for the Bank Independent checking account Los Portales used, which, Plaintiffs contend, shows checks written on behalf of both restaurants. (*See id.*; doc. 57-8 at 10 (¶¶ 32-34)). However, that underlying "fact" (that both restaurants wrote checks from the Bank Independent account) is, in fact, just another inference from the actual evidence, which shows that some of the checks from the Bank Independent account have "El Portal" printed above the address and some have "Los Portales" printed above the address. (*See* doc. 57-2 at 12 (¶ 9); doc. 57-8 at 9 (¶ 28); doc. 57-17 at 4-9 (showing some checks labeled "El Portal" and some "Los Portales"); doc. 57-18 at 5-8 (same)). The problem for Plaintiffs' argument is that it is undisputed in the record that Los Portales also ran a restaurant called "El Portal," and the addresses on all of the checks is the same, the address for the second "El Portal" restaurant run by Los Portales (Doc. 49-

21

3 at 7 (18) (stating the Los Portales, Inc. restaurant was called "El Portal"); doc. 49-9 at 13 (42-43) (stating the corporation is "Los Portales" and the restaurant is "El Portal"); doc. 49-9 at 15 (51) (noting the second El Portal restaurant's checks from the Bank Independent account were labeled "1315 Highway 31 Northwest, Hartselle, Alabama 35640"); doc. 57-8 at 9 (noting all the checks had the same address (1315 Highway 31 NW, Hartselle, AL 35640)); doc. 57-17 at 4-9 (showing some checks labeled "El Portal" and some "Los Portales"); doc. 57-18 at 5-8 (same)).   Even construing this evidence favorably to the Plaintiffs for purposes of Defendants' motion for summary judgment, the inference the two restaurants commingled funds is not reasonable.

The undersigned finds the two entities were not commingling funds and were not operating as a single enterprise.

### b. Requirements of 29 U.S.C. § 203(s)(1)

Under the second prong of the coverage analysis, the employee must prove the employer "(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A).  The only aspect of this in dispute is whether the relevant enterprise had gross volume of sales of at least $500,000.   (Doc. 50 at 15-18; Doc. 59 at 21-25).

Because the two restaurants were not engaged in a common business purpose, the enterprise is composed of only Los Portales, which did not report sales of over $500,000 any year between 2010 and 2013.  (Doc. 49-1 at 6, 13, 21, & 29).  However, Plaintiffs argue Los Portales

has underreported its gross sales on its tax returns, which should actually be much higher.  (Doc. 51-45 at 13-14; doc. 57-2 at 15).  The problem with this argument in support of their own summary judgment is that it is based on an expert report, which is based on documents, the authenticity of which Defendants have challenged based on the fact they were, for a time, not in the custody of the proper custodian and, in fact, in the custody of one of the plaintiffs.  As addressed above in the discussion of Defendants' objections to Plaintiffs' expert report, chain of custody issues do not render the document inadmissible but are an issue of the weight of the evidence for the jury to determine.  *See* discussion *supra* in Section II.B.2.  As a result, for purposes of Plaintiffs' summary judgment motion, the Court must take that evidence in favor of the nonmoving Defendants and find the evidence cannot be relied on, which, in turn, invalidates the expert's report relying on that evidence.  However, for purposes of Defendants' summary judgment motion, the chain of custody issue points the opposite direction, and the undersigned finds the evidence reliable.  Because Defendants did not otherwise challenge the expert report, Plaintiffs have established Los Portales underreported its gross sales sufficient to qualify it for enterprise coverage under the statute.

Plaintiffs have not established the relevant enterprise meets the requirements of 29 U.S.C. § 203(s)(1)(A), and there is no enterprise coverage for purposes of their motion for partial summary judgment.  Because they chose not to rely on individual coverage for purposes of their motion, they cannot establish the second element of their claim, and their motion for partial summary judgment, (doc. 51), is due to be **DENIED**.

### 2. "Employer"

Under the FLSA, the term "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  "[A]n entity

'employs' a person under the FLSA . . . if it 'suffers or permits' the individual to work.  An entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996) (citing 29 U.S.C. § 203(g); *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961)). Defendants' motion asserts that, because the server plaintiffs only worked at the second restaurant and Salazar never had direct control over their day-to-day activities, neither of them are those plaintiffs' "employers" under the statute.  (Doc 50 at 18-21).  Plaintiffs contend the two restaurants were a joint enterprise and that Salazar had sufficient control over the management of the restaurant to qualify as an employer under the statute.  (Doc. 57-2 at 20-24).  The parties' arguments on Plaintiffs' motion are redundant of their arguments on Defendants' motion.  (*See* doc. 59 at 25-31; doc. 63-1 at 10[9]).

### a. El Portal

"An employee may have more than one employer, and 'whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case.'" *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012) (quoting 29 C.F.R. § 791.2(a)).  "This case-by-case inquiry turns on no formula, but the court will consider factors such as control, supervision, right to hire and fire, ownership of work facilities, investment, and pay-roll decisions." *Cornell v. CF Ctr., LLC*, 410 F. App'x 265, 268 (11th Cir. 2011) (citing Antenor, 88 F.3d at 932 37).  The factors, however,

---

[9] However, Plaintiff does not respond to Defendants' assertion El Portal, Inc. is not an "employer" for purposes of the FLSA and, therefore, even if the undersigned had not recommended dismissal of the claims against El Portal, Inc. on the merits below, Plaintiffs would have abandoned this argument and not be entitled to summary judgment against it.

should not distract from the ultimate inquiry and are "are only useful to us to the extent that they shed light on the existence of economic dependence." *Layton*, 686 F.3d at 1181.  Defendants argue El Portal is not a proper defendant because Brito, Castillo, Domingo, and Segoviano only worked at the Los Portales restaurant.  (Doc. 50 at 19).  Plaintiffs contend that, "due to the conflating of the corporate entities here, particularly the bank accounts," there is a question of fact regarding whether El Portal employed the server plaintiffs.  (Doc. 57-2 at 20 n.2).

Although Marquez and Salazar supervised both restaurants, they did not supervise Brito, Castillo, Domingo, and Segoviano at the El Portal restaurant, and Plaintiffs do not give any reason why, when Marquez and Salazar were making employment decisions about the server plaintiffs, they were doing it on behalf of El Portal and not Los Portales.  (Doc. 49-3 at 7 (18-19); doc. 49-4 at 12 (41); doc. 49-5 at 8 (25); doc. 49-6 at 10 (31)).  For the same reason, there does not appear to be any way in which server plaintiffs' jobs were integral to the first restaurant's business. Despite having the same name, there were two separate buildings, (doc. 49-6 at 10 (31); doc. 49-7 at 12 (39)), housing two separate restaurants, (doc. 49-6 at 10 (31); doc. 49-7 at 12 (39); doc. 49-9 at 13 (43)), run under separate corporations, (doc. 49-9 at 12 (40-41)), which filed separate tax returns, (docs. 51-36 & 51-37).  The primary "conflation" Plaintiffs rely on is the alleged commingling of the bank accounts, (doc. 57-2 at 20 n.2); however, as stated above, the evidence does not support this allegation.  Plaintiffs' expert explicitly acknowledged the evidence does not indicate where the cash deposits originated, and Plaintiffs do not point to any evidence money from the first restaurant was deposited in the account for the second restaurant.  (Doc. 57-8 at 9-10 (¶ 29); doc. 57-17 at 1-12; doc. 57-18 at 1-8).  There is no evidence that, if the first restaurant

went completely out of business, it would have any effect whatsoever on Brito, Castillo, Domingo, and Segoviano's employment at the second restaurant.

As a result, there is no evidence indicating that, considering the totality of the economic reality, Brito, Castillo, Domingo, and Segoviano were dependent on the first restaurant, run through El Portal, Inc.  Therefore, their claims against El Portal, Inc. are due to be **DISMISSED**.

### b. Alvaro Salazar

The FLSA's definition of "employer" also includes corporate officers "with operational control of a corporation's covered enterprise."  *Patel v. Wargo*, 803 F.2d 632, 637 (11th Cir. 1986). Although such personal supervisory liability requires "involve[ment] in the day-to-day operation or . . . some direct responsibility for the supervision of the employee," *Wargo*, 803 F.2d at 638, it may be found indirectly through "the exercise of general supervisory powers or the exercise of control over other employees," *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1313 (11th Cir. 2013).   In particular, the FLSA attempts to encompass "those who control a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA."  *Id.* (internal quotation marks omitted).  Therefore, indirect control must be "must be both substantial and related to the company's FLSA obligations." *Id.* at 1314.  Defendants contend Salazar was not the server plaintiffs' direct supervisor because Marquez, as general manager, ran the day-to-day operations and the employees never discussed work with Salazar.  (Doc. 50 at 20).  Plaintiffs note both that a higher level of control can still create FLSA liability as long as there was some ultimate control over wages, and the higher level supervisor can still garner liability by being involved in operations on an intermittent basis.  (Doc. 57-2 at 22-23).

Defendants' attempt to push all of the liability for the alleged FLSA violations on Marquez by repeatedly listing all of Marquez's duties over the day-to-day operation does not shield Salazar from liability. Even if those duties are strong evidence Marquez is an employer under the FLSA, Marquez's testimony Salazar ordered him to not put some employees on the payroll and that Salazar "always had the last word" creates a question of fact whether Salazar had overarching control of the way wages and payroll were run in the restaurants. (Doc. 49-7 at 22 (78-80)). Even if he never spoke to the employees directly about their work, if, through Marquez, he controlled the way the day-to-day operation was run (especially regarding the alleged payroll violations), he is an employer under the FLSA. *See Lamonica*, 711 F.3d at 1313-14. Because there is a question of fact as to the control Salazar exercised over the restaurants, the parties' cross-motions for summary judgment on the claims against Salazar are due to be denied on this ground.

### c. Oscar Marquez

Defendants also argue Marquez was the server plaintiffs' employer and should be realigned as a defendant. (Doc. 50 at 21). Plaintiffs respond that Marquez was not an employer because Salazar retained strict control over Marquez's actions on a day-to-day basis. (Doc. 57-2 at 24-25). Although there does appear to be a question of fact as to who the server plaintiffs' employers were, it is irrelevant whether Marquez was. Plaintiffs are masters of their own complaint and have "the option of naming only those parties the plaintiff[s] choose[] to sue, subject only to the rules of joinder [of] necessary parties." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 91 (2005) (quoting 16 J. Moore et al., Moore's Federal Practice § 107.14[2][c], p. 107–67 (3d ed. 2005)). Even if Marquez is an employer under the FLSA, Plaintiffs need not bring such a claim against him. If Marquez is liable for the FLSA violations and Salazar is not, it is Plaintiffs' prerogative to risk recovering

from neither over attempting to recover from Marquez.  Moreover, Defendants cite no authority

for, and make no procedural argument in support of, the proposition Marquez should be realigned

as a party-defendant.

### 3. Violations of the Minimum and Overtime Wage Requirements

#### a. Oscar Marquez

Defendants' motion contends Marquez is not entitled to unpaid minimum wage or overtime

pay because he is an exempt salaried employee under the FLSA and, even if he were not, the

amount he was paid was sufficient to pay him minimum wage and overtime.  (Doc. 50 at 23-26).

Plaintiffs respond there is a question of fact whether his primary duty was management and, at

least during the last six months of employment, he was not paid the minimum amount required to

be exempt.  (Doc. 57-2 at 26-29).

> An employee is an exempt executive employee if he is
>
> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.  *See also* 29 U.S.C. § 213(a)(1) ("The [minimum wage and maximum hour

provisions of the FLSA] shall not apply with respect to "any employee employed in a bona fide

executive . . . capacity . . . .").

Plaintiffs contend Marquez's primary duties were not management because "every decision" required a call to Salazar.  (Doc. 57-2 at 28).  Whether management is a "primary duty" requires consideration of "[1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700; *accord Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008) (including, in addition, "the frequency with which an employee may exercise discretionary powers").  At least until the last two years of his employment, Marquez had standing permission to pay suppliers, (doc. 49-7 at 22 (78)), could hire and fire employees, (*id.* at 12 (41)), set work schedules, (*id.* at 12-13 (41-42)), and handled the restaurant's business records, (*id.* at 13-14 (45-46)).  He also performed these functions for the other restaurant, (*id.* at 49-7 at 12 (40)), and was paid considerably more than the nonexempt employees because his salary equated to over twice minimum wage, (*id.* at 33 (123)).  However, there are questions of fact as to the extent to which he was allowed to exercise discretion when performing his duties.  He testified that Salazar always had the last word on "problems, paperwork," "personnel change[s]," down to whether a chef who cut his finger should go to the hospital or get a Band-Aid.  (Doc. 49-7 at 22 (78-79)).  Even when Marquez hired new employees, he would confirm with Salazar whether to put them on payroll.  (*Id.* at 22 (79-80)).  Because there are questions of fact on issues underlying whether and when Marquez met the executive exemption requirements, the undersigned cannot, when considering the evidence in Plaintiffs' favor, find Marquez was exempt; therefore, his claims under the FLSA are not due to be dismissed on this ground.

Defendant also specifically argues Marquez is not entitled to overtime because he testified he only worked forty hours per week. (Doc. 50 at 26). In their response, Plaintiffs note he also testified to "sometimes" going over by "two or three hours." (Doc. 57-2 at 27 n.5). In the context of Marquez's deposition, and viewed most favorably to the Plaintiffs, the latter modifies the former, which is not a denial Marquez worked uncompensated overtime but a general statement of Marquez's usual schedule. (*See* doc. 57-3 at 46-47 (177-178)). Defendants' motion is due to be denied as to Marquez's overtime claims.

### b. *In Pari Delicto* Defense

Defendants contend any recovery by the plaintiffs is barred by the *in pari delicto* defense, which forecloses recovery of damages by a plaintiff who has participated in the wrongdoing of which he or she complains. (Doc. 50 at 26-27). In support, they allege Marquez bears sole responsibility for the FLSA violations due to his management responsibilities, while the other plaintiffs are complicit in Marquez's violations for failing to report them to Salazar. (Doc. 50 at 27). Plaintiffs argue the *in pari delicto* defense is inapplicable because Marquez does not bear essentially equal responsibility for the FLSA violations, none of the plaintiffs besides Marquez actually violated the FLSA themselves, and, in any event, applying the defense would frustrate the purpose of the FLSA—protecting employees from exploitation by their employers. (Doc. 57-2 at 29-31).

The *in pari delicto* defense bars recovery under a federal statute "only where (1) the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of the suit would not substantially interfere with the statute's policy goals." *Lamonica*, 711 F.3d at 1308. Under the first prong of the *in pari delicto* inquiry, the question is

30

whether the plaintiff is "an active, voluntary participant in the unlawful activity *that is the subject of the suit*." *Id.* at 1309 (quoting *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)) (emphasis in original).

Applying the first prong of the *in pari delicto* defense to Marquez,[10] Defendants attempt to conflate the FLSA violation he claims with the FLSA violation the servers claim.  In order for the *in pari delicto* defense to bar Marquez's recovery, Defendants need to demonstrate not that Marquez participated in underpaying the servers but that he participated in underpaying *himself*. *See Lamonica*, 711 F.3d at 1309 (emphasizing the relevant inquiry is the unlawful activity alleged by the plaintiff, "not just any causal relationship or topical connection").  In any event, even if Marquez's participation in the FLSA violations alleged by the servers suffices for his *in pari delicto* complicity, the undersigned cannot say the facts viewed in the light most favorable to the plaintiffs regarding control of the restaurant support an equal degree of responsibility for Marquez (as opposed to Salazar) for the FLSA violations.  *See* discussion *supra* at Section IV.A.2.b.

Defendants' argument as to the first prong of the *in pari delicto* defense for Segoviano, Brito, Domingo, and Castillo is even more tenuous.  Defendants argue failing to report FLSA violations is a part of the unlawful activity and the equitable equivalent of failing to pay overtime or a minimum wage, and thus the server plaintiffs' recovery is barred.  Again, though, the question is not whether there is a causal connection between the wrongful activity alleged by a defendant and the subject of the suit; the question is whether the activity itself is "the subject of the suit." The FLSA violation alleged by the servers is the failure by their employer(s) to pay them consistent with the FLSA, not their failure to be placed on the payroll.  In addition, taking inferences

---

[10] As stated *supra*, Plaintiffs do not seek summary judgment for the claims against Marquez, so the facts are construed favorably to Marquez for purposes of this section.

favorably to the Plaintiffs, Salazar knew of and directed the FLSA violations, so at a minimum a factual dispute exists as to the degree of responsibility for the violations between the servers and Salazar sufficient to deny Defendants summary judgment on the defense.

Under the second prong of the *in pari delicto* defense, the question is whether the policy goals of the statute at issue would be offended by applying the defense.  Among the FLSA's policy goals is employer deterrence, and "[w]here . . . an employer knew or had reason to know that its employee underreported his hours, it cannot invoke equitable defenses based on that underreporting to bar the employee's FLSA claim."  *Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 804-05 (11th Cir. 2015).

Even if Defendants had demonstrated participation in and substantially equal responsibility for the violations by either the server plaintiffs or Marquez, however, Defendants have made no argument as to the second prong of the *in pari delicto* defense.  Thus, they have failed to establish an element of the defense with respect to any plaintiff.  Even assuming *arguendo* Defendants had offered a policy argument in their motion for summary judgment, to the extent knowledge of the server plaintiffs' FLSA violations are imputed to their employer—which, for the purposes of Defendants' motion, is both Salazar and Los Portales—the Eleventh Circuit has explicitly foreclosed the availability of the *in pari delicto* defense.  *TitleMax*, 776 F.3d at 805.

**B. Breach of Contract**

Defendants argue Marquez has offered no evidence he was owed two weeks of paid vacation and thus cannot support his claim for breach of contract.[11]  (Doc. 50 at 28).  The only

---

[11] Plaintiffs also assert a breach of contract claim for Defendants' alleged failure to compensate them commensurate with the FLSA.  (Doc. 14 at ¶¶ 56, 58-59).  Defendants do not address this portion of Plaintiffs' breach of contract claim in their motion.

reference Plaintiffs make to the breach of contract claim for the two weeks paid vacation allegedly owed to Marquez in their response is a footnote in which they simply restate the allegation in the complaint.  (Doc. 57-2 at 27-28 n.5).  Plaintiffs do not actually acknowledge Defendants' argument at all, much less point to evidence to rebut Defendants' claim.  As a result, this claim is abandoned. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

### C. Fraud

Defendants' motion for summary judgment contends Plaintiffs have failed to allege fraudulent conduct or reliance with the specificity required under Rule 9 of the Federal Rules of Civil Procedure, or to offer any evidence of fraudulent conduct by any of Defendants.  (Doc. 50 at 28).  Plaintiffs do not mention this claim in their opposition to Defendants' motion.  (*See* doc. 57-2; doc. 60 at 13).  Thus, this claim is also abandoned.

### V. Recommendation

The undersigned **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED IN PART** to the extent it seeks dismissal of Marquez's breach of contract claim for unpaid vacation, Plaintiffs' fraud count, and all claims against El Portal, Inc.; and **DENIED IN PART** to the extent it seeks other relief.

The undersigned **FURTHER RECOMMENDS** Plaintiffs' motion for summary judgment be **DENIED**.

## VI. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal, except for plain error.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.  If objections are filed, the opposing party has ten (10) additional days to file a response to the objections.

DONE this 12th day of January, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

34